GLORIA CERVENY, Plaintiff-Appellant, v. AMERICAN FAMILY INSUR-ANCE COMPANY, Defendant-Appellee.

First District (2nd Division)    No. 1—92—2940

Opinion filed September 28, 1993.—Rehearing denied October 20, 1993.

Tuohy & Martin, Ltd., of Chicago (John L. Martin, of counsel), for appellant.

Coleman & O'Halloran, Ltd., of Chicago (Robert N. Hilbert, of counsel), for appellee.

JUSTICE SCARIANO delivered the opinion of the court:

On April 12, 1987, while driving her daughter's automobile, plaintiff Gloria Cerveny was involved in an automobile accident with a motorist who carried a liability insurance policy which had a $30,000 ceiling. Because she deemed that motorist's insurer's tender of the maximum policy amount inadequate, she made a claim pursuant to the underinsured motorist provision of her daughter's insurance policy, written by defendant American Family Insurance Company, and seeking damages in excess of the $30,000 she had already received. After the parties failed to reach agreement on an appropriate amount, they waived arbitration, and plaintiff filed suit against defendant in circuit court. The sole issue to be tried was the nature and extent of plaintiff's damages.

Plaintiff was waiting to make a left-hand turn while her traffic signal was green when her auto was broadsided by a motorist who drove a Ford Maverick through a red light, striking the driver's side of plaintiff's car. Plaintiff estimated that at the moment of the collision, the other vehicle was proceeding at 50 or 60 miles per hour, and never slowed before hitting her.

Christopher Wolff, who was in his vehicle directly behind plaintiff's, where he too was waiting to make a left-hand turn, testified that he noticed a Ford Maverick as it travelled down a hill east of the intersection where both his and plaintiff's cars were standing. He believed that the Maverick collided with plaintiff's car while proceeding at approximately 30 miles per hour. Mary Holtze also observed the accident from a vantage point approximately 25 feet west of the impact. She was travelling immediately behind the Maverick as it approached the intersection where the traffic signal for her and the driver of the Maverick had turned red. The Maverick, without heeding the signal, continued through the intersection and struck plaintiff's car. She estimated the speed of the Maverick to be 15 or 20 miles per hour at the time of impact, and she recalled that its brake lights were lit before it made contact with plaintiff's car, although she could not recall if its braking left any skid marks on the pavement. When Holtze went to offer her assistance to the victims of the collision, she found plaintiff to be very upset, but she did not see any blood in or around plaintiff's mouth, nor did she detect any other signs of physical injury that plaintiff may have sustained.

Robert Weiss, a firefighter/paramedic for the Lisle-Woodridge fire district, was the first medic to treat plaintiff after the accident. Upon his arrival at the scene, he took a history from plaintiff, noting that she was fully conscious and alert and had situational awareness of the events which had transpired. He observed that the steering wheel showed no signs of damage and concluded therefrom that she had suffered no blunt trauma to her chest. Weiss recorded no evidence of blood flowing from her mouth, yet the mouth, like the nose and the eyes, was one of the organs he normally checked as a part of his triage evaluation. Plaintiff at first complained only of painful knees, but later mentioned pain in her lower back as well. She informed Weiss that she was afflicted with arthritic knees, for which she took aspirin. He did not recall her exhibiting any difficulty in walking nor did he have any difficulty understanding her responses to his questions.

Weiss' overall impression was that she had suffered the minimal effects of a minor traffic accident. In fact, plaintiff declined a ride in the ambulance to the hospital, telling Weiss that she did not want to

go there without her daughter. Consequently, the police who were called to investigate the accident drove her home where, upon arriving, she complained of experiencing dizziness and lower back pain while in the police car. Plaintiff's daughter, Diane Cerveny, recalled that she was assisting plaintiff out of the police car when plaintiff fainted. This prompted Diane to call for an ambulance to take plaintiff to the hospital, and Weiss responded to the call.

Diane related that once they had arrived at the emergency room of the hospital, she noticed that plaintiff was holding the top plate of her dentures, which was cracked in half and held together only by the skin-like membrane which covers the appliance. She asked plaintiff what had happened, and, although it was difficult to understand plaintiff, she informed Diane that she had hit her head in the accident and the impact had broken her denture.

On the day of the accident, Bruce Hendrickson, M.D., who was on duty in the emergency room of Edwards Hospital in Naperville, where plaintiff was taken for treatment following the accident, performed a full physical examination of her which disclosed no radical abnormalities. Her knees were not tender and had no effusions or fluid in the joints, nor were they unstable, thus suggesting no possible tears to the ligaments in the knees. But plaintiff did complain of pain when he conducted a range of motion test on the knees. His inspection of her head showed no apparent injuries, and although he could not recall if he examined her mouth, he made no notations on her chart indicating that he noticed blood flowing from it. He summarized his findings on the day of the accident by noting an absence of any objective evidence of trauma.

Plaintiff sought further medical treatment on April 27, 1987, from her personal physician, Allen Malnak, M.D., explaining that because she trusted no other doctor, she waited for him to return from his honeymoon. Malnak had been her physician since 1981 and during that time, he had treated her for injuries which she had sustained in three prior automobile accidents, which treatments included the draining of fluid from her knees. Dr. Malnak also treated her for the onset of osteoarthritis in her knees, lower back, and wrists. In 1984, an X ray of one of plaintiff's knees showed a considerable arthritic change which Malnak interpreted to be pseudogout, which is the formation of nonuric acid crystals on the knee, and which he opined was caused by the wear and tear on the knees that accompany normal usage.

Dr. Malnak referred plaintiff to Henry Acuna, M.D., a board-certified orthopedic surgeon who first saw her in July 1985. At that time, she complained of pain in both knees and difficulty in climbing stairs.

After an examination and a withdrawal of fluid from the knees, his diagnosis was that she had osteoarthritis, bursitis, and/or pseudogout, and he did not rule out the possibility of a torn cartilage. Acuna saw her again in 1985 and determined that she may have had patellar tendonitis or an irritated tendon.

The next time Dr. Acuna saw her was after the accident when his examination disclosed that she may have been suffering from chrondromalacia or a softening of the lining of the cartilage of the knee. His prognosis was that arthroscopic surgery on the knee was needed to repair the damage. In his expert opinion the deterioration of the knee was caused by the trauma plaintiff experienced in the accident of April 12, 1987, since one possible factor which would aggravate an osteoarthric knee was trauma. On cross-examination, Dr. Acuna reiterated that prior to the accident, she did suffer from osteoarthritis which, he admitted, could have been caused by stress to the knees, heredity or the fact that plaintiff was markedly overweight.

Michael Grear, M.D., a board-certified orthopedic surgeon, next treated plaintiff for the continuing pain in her knees in November 1990. His examination disclosed that she was slightly overweight and suffered from muscle spasms in the lumbar region of her lower back. Her knees evidenced significant crepitation and did not have a full range of motion, but showed no effusions or fluid collection within the joint. Based on his objective findings and her subjective complaints of pain, he recommended a surgical debridement of the right knee. She did not immediately consent to surgery but returned to Grear in February 1991 with similar complaints and he again offered the same prescription. This time she agreed that surgery was necessary, and on February 2, 1991, Grear performed an arthroscopic abrasion athroplasty of her right knee and removed a torn meniscus. In a follow-up visit after the procedure, he noticed that she had regained some of the lost range of motion of the knees, but she still complained of intermittent pain and found it difficult to climb stairs or exit cars. He found that at that point, the cartilage of plaintiff's knees had degenerated so that, at the joints, there was bone-to-bone contact which had caused her legs to bow inward. Grear posited that the condition of the knees at that time was caused by an aggravation of her osteoarthritis by the trauma to the knees plaintiff endured in the 1987 accident. He estimated the cost of repair of the knees to be around $40,000.

On cross-examination, Grear admitted that he received compensation to testify for plaintiff. He also agreed that in general, bowleggedness had many possible root causes. He listed heredity, weight, or

even degenerative arthritis. He clarified his opinion by stating that although he believed that the accident contributed to the deterioration of the knee, he had insufficient information regarding the accident to fix with any degree of precision the extent of its contribution.

Grear also was allowed to testify as an expert for the defense over vigorous objection by plaintiff, who maintained that his testimony violated the court's pretrial order which barred defendant from offering expert testimony as a sanction for its noncompliance with Supreme Court Rule 220. (134 Ill. 2d R. 220.) During this part of his testimony, Grear reviewed and interpreted X rays of plaintiff's knees dating back to 1984 and stated that the changes seen on the films could be ascribed to a natural chronological degradation of chronically arthritic knees. On cross-examination, he disclosed that defendant had paid him $1,400 to testify and he reemphasized that while natural degradation of the knees could be a possible cause of their present state, in his opinion, the actual cause was the trauma plaintiff experienced as a result of the accident.

Joanne Baxter, D.D.S., a dentist specializing in prostodontics or reconstructive dentistry, first examined plaintiff on July 20, 1987, when she discovered that plaintiff's denture was fractured along the midline and the upper denture was missing a tooth. Since the appliance was made of chrome cobalt, a material she characterized as "very hard," she felt that it must have been bent by an extreme force, as, according to her estimate, it would go undamaged even if one were to stomp on it with his or her foot. Consequently, she believed that the injury to plaintiff's mouth was due to the facial impact incurred in the accident. She admitted that this belief was premised on information she had received from plaintiff, who had described the accident for her. She had advised plaintiff to authorize the reconstruction of her denture which would have cost $3,500 in 1987.

Plaintiff again visited Baxter in 1990. This time Baxter observed extensive deterioration of the mouth. She had worn down her lower teeth, which would have to be crowned at an additional expense, and plaintiff still needed the new prosthesis and now also needed a diagnostic appliance. Baxter estimated that the total cost of these procedures would amount to $12,000. She saw plaintiff again in February 1992, when once again she found alarming and persistent deterioration of her mouth. Her prognosis now included addressing a chronic gum loss, which would necessitate the use of complex diagnostic appliances, implantation of a plastic bridge to replace lost bone, and the replacement of the old denture. She estimated the cost of those procedures to be $40,000. Baxter admitted on cross-examination that she

based her opinion as to the cause of plaintiff's oral injuries on the history which plaintiff had provided and that she could not rule out the possibility that the sole cause of the damage was a blow plaintiff took on the jaw in a previous fall.

Aside from her medical complaints, future medical expenses and the approximately $12,000 in medical bills she incurred, plaintiff also claimed that she lost her position as a real estate agent because of the accident. Although she had earned $26,000 in 1986 and $15,000 in 1985, her income declined to $10,400 for 1987, the year of the accident, after which she was no longer employed as a real estate salesperson.

The jury returned a verdict in her favor in the amount of $60,000, which amount the court reduced by the $30,000 plaintiff received from the actual tortfeasor's insurance carrier and entered judgment against defendant in the amount of $30,000.

# I

■ Plaintiff protests that the jury's award of $60,000 was a wholly inadequate amount. She acknowledges that one of the bedrock principles of our law is that in a personal injury action, questions which concern damages are peculiarly within the realm of the jury and that courts must exercise great restraint prior to interfering with its determination of the amount which compensates a plaintiff for the loss she suffered. (*Flynn v. Vancil* (1968), 41 Ill. 2d 236, 240, 242 N.E.2d 237, 240; *Chambers v. Rush-Presbyterian-St. Luke's Medical Center* (1987), 155 Ill. App. 3d 458, 508 N.E.2d 426, *appeal denied* (1987), 116 Ill. 2d 549, 515 N.E.2d 102.) She maintains, however, that given the relatively modest award when compared to the extent of the damages which she claims she suffered, judicial intervention is called for in order to ensure that complete justice is done in this case.

■ It has been held that a jury's assessment of damages will not be disturbed unless: (1) it is demonstrably inadequate or against the manifest weight of the evidence; (2) the amount is either erroneous or based on passion or prejudice; (3) the jury's award bears no reasonable relation to the injury suffered by the plaintiff as a result of the defendant's conduct (*McKenzie v. Romeiser* (1990), 205 Ill. App. 3d 830, 834, 563 N.E.2d 837, 840); or (4) it is clear from the record that the jury disregarded proven elements of damages. (*Robin v. Miller* (1978), 67 Ill. App. 3d 656, 662, 384 N.E.2d 889, 893.) Plaintiff argues that the jury's award implicated all of the above with the exception of being based on passion or prejudice, and thus, this court is obliged to

reverse the award and remand for a new trial on the issue of damages.

We emphasize at this point that a jury's award will not be found to be against the manifest weight of the evidence merely because it can be characterized as less than generous. (*Gruidl v. Schell* (1988), 166 Ill. App. 3d 276, 519 N.E.2d 963.) Furthermore, it is of no consequence to the validity of an award that it differs from an estimate of damages made by an expert, for a jury may reduce an expert's damage calculation without invalidating its verdict. *F.L. Walz, Inc. v. Hobart Corp.* (1992), 224 Ill. App. 3d 727, 586 N.E.2d 1314; *Carter v. Chicago & Illinois Midland Ry. Co.* (1985), 130 Ill. App. 3d 431, 437, 474 N.E.2d 458, 463 ("Although the expert placed the present value of pecuniary loss attributable to the decedent's death at $258,966.30, the jury was not bound by that figure").

■ Here, the objective evidence of out-of-pocket expenses incurred due to the injury totalled only $12,000; any award in excess of that amount was fully dependent on the believability of plaintiff with regard to the pain, suffering and disability she experienced along with the jury's acceptance of the opinion of her experts regarding the amount of the future expenses they expected she would incur as a direct and proximate result of the accident. The jury was, of course, not bound to accept the testimony of the experts and other witnesses, but rather was free to discount the weight given to their testimony after an assessment of the witnesses' credibility. (See *Steele v. Brown* (1963), 43 Ill. App. 2d 293, 193 N.E.2d 352.) With regard to the testimony of experts, our supreme court has only recently explained:

> "The weight accorded expert testimony must be decided by the trier of fact. [Citation.] Even if several competent experts concur in their opinion and no opposing expert testimony is offered, it is still within the province of the trier of fact to weigh the credibility of the expert evidence and to decide the issue. [Citation.]" (*In re Glenville* (1990), 139 Ill. 2d 242, 251, 565 N.E.2d 623, 627.)

In the case at bar, there are sufficient indications in the record to raise doubts as to the credibility of plaintiff's testimony, as well as to the bases of the opinions of her experts; therefore, the jury's award cannot be said to be against the manifest weight of the evidence.

With regard to the credibility of plaintiff, defendant offered the testimony of Mary Holtze, a disinterested occurrence witness who estimated that the automobile which struck plaintiff was travelling at a speed of less than 20 miles per hour immediately prior to impact. This was substantially at odds with the testimony of plaintiff, who in-

formed the jury that she was hit by a vehicle travelling at a speed in excess of 50 miles per hour. Holtze's estimate was substantially corroborated by another occurrence witness, Christopher Wolff, who was following immediately behind plaintiff's auto and who guessed that the other automobile approached plaintiff at a rate of approximately 30 miles per hour. No witness buttressed plaintiff's assertion that the impacting vehicle hit her automobile at a speed anywhere near 50 miles per hour. Thus, the jury reasonably could have found that given the speed ascribed by Holtze and Wolff to the Ford Maverick at the time of impact, most of the injuries plaintiff complained of were not causally linked to the accident, which finding could have reasonably led the jury to reduce her award in accordance with that determination.

Moreover, although all of plaintiff's experts opined that there was a direct causal link between the accident and plaintiff's aggravated osteoarthritis, defendant did elicit from each that there could have been other potential causes for her injuries. For instance, Dr. Baxter expressed her belief that the degradation of plaintiff's jaw and palate was due to the accident and that in order to make her whole, it would necessitate the expenditure of approximately $40,000 in massive dental reconstruction. However, on cross-examination, she could not unequivocally deny that the injury to the mouth which precipitated its subsequent catastrophic state may have been the result of a fall plaintiff took three years before the accident. Dr. Baxter, in testifying that the cracking of the dental appliance which ultimately caused the deterioration of plaintiff's dental infrastructure was due to trauma to the mouth, also conceded that she formed her opinion while relying upon a history provided by plaintiff. Included in that history was plaintiff's representation that in the 1987 accident, she was struck by an auto travelling at a speed in excess of 50 miles per hour, an estimate later belied by the testimony of others who witnessed the accident.

Each of the orthopedic specialists plaintiff proffered also grudgingly admitted that he or she could not exclude the possibility that the aggravation of her arthritis was the result of some cause other than the trauma she experienced in the accident. The aggravation could have been related to her obesity, hereditary factors, or the natural degradation of the joints. Clearly, the jury's disbelief of the testimony of both plaintiff and her experts could reasonably have had some basis in the evidence presented to it, or may be explained thereby; therefore, its award, which was reasonable, considering the evidence presented at trial, need not be reversed.

We find this case factually dissimilar to the two offered by plaintiff in support of her argument. In both *Schranz v. Halley* (1984), 128 Ill. App. 3d 125, 469 N.E.2d 1389, and *Kelly v. Reynolds* (1971), 132 Ill. App. 2d 1098, 271 N.E.2d 370, the only possible explanation for the amount of the jury's verdict in each case was that it had overlooked or gave no credence to damages which had been *indisputably* proven, thus necessitating reversal of its verdict. In *Schranz*, the jury awarded damages in an amount equal to the precise cost of proven medical bills, and in order to emphasize the fact that it found plaintiff entitled to recover only past paid medical bills, a juror inscribed on the verdict form "medical bills as presented" next to the amount of the award, thus leading ineluctably to the conclusion that the jury gave no compensation to the plaintiff for the pain and suffering she unquestionably suffered. The court held that although the amount of compensation to which one was entitled for past pain and suffering was left to the jury's wisdom, where no compensation was given, reversal was in order. In *Kelly*, the jury awarded $2,000 even though the plaintiff incontrovertibly established that she had not only incurred out-of-pocket expenses of $2,020.80, but that she also presented unchallenged testimony that she was afflicted to some extent with a permanent injury and endured some measure of pain and suffering. The court held:

> "[W]here there is uncontradicted evidence of medical expenses and lost wages, of permanent injuries and pain and suffering, there can be little doubt that a verdict for less than the sum total of the special out-of-pocket expenses in no way follows the proper instructions of the court to compensate the plaintiff for his injuries, temporary and permanent, his disability, pain and suffering, medical expenses and lost earnings. *** Under the posture of the evidence in this case a verdict in a lesser amount than the uncontradicted out-of-pocket expenses is manifestly inadequate—indisputably insufficient." *Kelly*, 132 Ill. App. 2d at 1103, 271 N.E.2d at 373.

The instant case lacks the clarity which compelled the courts in both *Schranz* and *Kelly* to conclude that the jury totally discounted proven elements of damages. As discussed previously, we find that the extent of the plaintiff's recovery must have necessarily turned completely on her credibility and whether the jury believed that the accident caused the full extent of plaintiff's injuries. From the record before us, we deem it eminently reasonable to conclude that the $60,000 award was intended to compensate plaintiff for what the jury must have perceived to be a relatively minor aggravation of a

preexisting injury and that, therefore, the pain and suffering which was attributable to that injury would be concomitantly minor as well. This is certainly not a case where the only possible conclusion is that the jury overlooked an objectively proven incident of injury; thus, the rules of *Schranz* and *Kelly* are inapplicable.

## II

Plaintiff contends in the alternative that the court erred with regard to various evidentiary matters at trial and that these errors warrant reversal of its judgment and a new trial on the issue of damages.

## A

■ Plaintiff first complains that certain questions asked during the cross-examination of her daughter, concerning Diane's chronic affliction with lupus,[1] and to which plaintiff objected, were improper. Since during trial she registered only general objections to these questions, we assume that she found them to be irrelevant to the issues of the case. (See M. Graham, Cleary & Graham's Handbook of Illinois Evidence §103.2, at 7-8 (5th ed. 1990) ("A general objection such as 'I object, the evidence is irrelevant, immaterial, incompetent, and inadmissible' raises only the question of relevance. [Citations]").) In *In re Elias* (1986), 114 Ill. 2d 321, 499 N.E.2d 1327, our supreme court defined "relevance" with reference to Rule 401 of the Federal Rules of Evidence, which provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

Measured by that definition, the court did not err by overruling plaintiff's objections. The questions put to plaintiff's daughter concerned the medical problems she experienced before, during, and after the accident. Defendant's theory of the case was that many of plaintiff's claimed physical maladies were not caused by the accident, but were the psychosomatic manifestations of the extreme

---

[1]Lupus is defined as: "Any of several diseases of the skin and mucous membranes, many causing disfiguring lesions, esp.: a. Lupus vulgaris, characterized by ulcerating, nodular facial lesions, esp. around the nose and ears. b. Lupus erythematosus, characterized by eruption of atrophic scarred lesions with chronically inflamed margins." American Heritage Dictionary 747 (2d C. ed. 1985).

pressure she was under at the time of the accident; namely, an overwhelming concern for her daughter, who had been recently rehospitalized for a flare-up of lupus. Defendant was certainly entitled to present evidence tending to show that not all of plaintiff's injuries were caused by the accident. (See *O'Brien v. Thomas Steel Corp.* (1989), 181 Ill. App. 3d 901, 538 N.E.2d 1162 (holding that evidence of the plaintiff's preexisting physical and mental condition was admissible to show, *inter alia,* cause of subsequent physical condition).) Thus, evidence of a serious illness suffered by plaintiff's daughter, which would be highly probative of defendant's theory, was relevant and, therefore, a proper subject to be explored during cross-examination.

## B

■ The same may be said with reference to plaintiff's next complaint wherein she argues that it was error to allow defendant to question her on the filing of her Federal income tax returns. She maintains without elucidation that the question was collateral and therefore inadmissible. This assertion is unavailing, however, as a question is considered collateral if it has *no* value to the cross-examiner's case other than to contradict the in-court testimony of a witness. (*Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 529 N.E.2d 525.) In the case *sub judice*, the questions put to her regarding her tax returns were relevant to the issue of damages, and thus were properly allowed by the trial court.

Plaintiff sought lost wages and lost future earning capacity as elements of her alleged damages. During her case in chief, however, she never offered any proof of actual past earnings. Instead, she used her direct testimony to portray herself as a successful real estate salesperson, leaving the impression with the jury that her lost future earnings would be as substantial as her past income apparently had been. In its effort to advise the jury of her modest actual wages, defendant questioned her on the net income which she reported to the Internal Revenue Service, during which cross-examination she disclosed that she failed to file returns for some of the years between 1987 and 1991. The following colloquy contains the question and answer which plaintiff found objectionable.

"[MR. HILBERT (counsel for defendant)]: Did you file income taxes in 1987, '88, '89, '90 and '91?

MR. MARTIN [(counsel for plaintiff)]: Objection to whether or not this lady filed income tax returns.

THE COURT: It's relevant to some of the—

MR. MARTIN: Let me be heard on this, please.

THE COURT: See if [plaintiff] can answer yes or no whether she filed them. It's very simple. Do you recall if you filed them or not?

[PLAINTIFF]: Some are filed, some aren't.

THE COURT: Ask the next question."

Plaintiff maintains that this is the type of inquiry that we found to be irrelevant and improper in *Pozzie v. Mike Smith, Inc.* (1975), 33 Ill. App. 3d 343, 337 N.E.2d 450. We disagree because we find *Pozzie* to be distinguishable from the instant case. In *Pozzie*, in *dicta*, we held that it was error for the trial court to allow the defendant to delve extensively into the plaintiff's income tax returns. As a part of this cross-examination, the defendant inquired of the plaintiff whether each claimed deduction was warranted and whether all of the income derived from his business was disclosed. Although earlier in the opinion, the *Pozzie* court had ordered a new trial on damages for unrelated reasons, it still found it necessary to admonish the defendant that, on retrial, its transparent attempt to discredit the plaintiff in front of the jury with irrelevant matters would not be countenanced.

Conversely here, defendant did not verbally scrutinize each entry made on plaintiff's return before the jury in an attempt to lead it to infer that the return was fraudulent; rather, it merely asked her whether she filed returns, and after receiving her equivocal response, it moved on without any follow-up exploitative questioning. In addition, it made no reference to her failure to file any of the indicated returns during its summation to the jury. We find this case to be analogous to *Wigington v. Faulkner* (1964), 51 Ill. App. 2d 220, 201 N.E.2d 253 (abstract of opinion), where we found that probing into the plaintiff's tax returns was an appropriate subject for cross-examination especially since the plaintiff was seeking lost wages as an element of damages and his testimony was somewhat confusing on precisely how much income had been lost. Likewise, in the case at bar, lost income was among the elements of damage for which plaintiff sought compensation. More important, plaintiff's proof of lost wages was not merely confusing, but was nonexistent, thus compelling defendant to clarify for the jury's benefit the range

of her actual income.[2] Therefore, as in *Wigington*, because it was relevant to an issue in the case, it was not error for the circuit court to allow defendant to pursue a line of questioning with regard to plaintiff's income tax returns.

In addition, we remind plaintiff that she "is not entitled to an absolutely error-free trial," but only to a fair one. (*Lawson v. G.D. Searle & Co.* (1976), 64 Ill. 2d 543, 559, 356 N.E.2d 779, 787.) A party does not establish the necessity of reversal for an alleged error concerning the admission of evidence unless that party can overcome the burden of showing that the error materially affected the outcome of the trial. (*Jackson v. Pellerano* (1991), 210 Ill. App. 3d 464, 569 N.E.2d 167.) In the case at bar, plaintiff does not even attempt to persuade us that defendant's inquiry into her tax returns had any negative impact on the jury's award of damages. She states only that the evidence "was prejudicial because the jury might have believed that plaintiff was unworthy of belief." It is also quite possible that the jury concluded that for the years in which she filed no tax returns she

---

[2]Although defendant never raised this concern in either the circuit court or in this court, we note parenthetically that, given the approach which plaintiff elected to follow in order to prove the extent of her lost wages, had defendant moved for a directed verdict in its favor on that element of damages, the circuit court would surely have been obliged to grant the motion. It is universally accepted that in order to bear her burden in this regard, a plaintiff must offer something more than her unsupported averment as to past income or lost earning capacity. (22 Am. Jur. 2d Damages §155, at 146 (1969) ("It is improper to make an award of loss of earnings in the absence of any effort to corroborate plaintiff's testimony, such as by use of income tax returns or testimony from the plaintiff's employer"); see also *Johnson v. Great Atlantic & Pacific Tea Co.* (1983), 92 A.D.2d 884, 459 N.Y.S.2d 871 (reducing an award of $400,000 to $100,000 because, *inter alia*, the plaintiff, a real estate salesman, offered nothing to substantiate his claim that prior to his accident, he had been a successful agent and speculator who earned at least $25,000 a year).) Here, in her case in chief, plaintiff did not even go so far as to state a precise or approximate amount of past earnings. Instead, she attempted to portray herself as a successful salesperson who previewed and showed anywhere from 30 to 60 homes a week, leaving it to the jury to theorize the salary such a busy salesperson would earn. But one may not prove damages by speculation or conjecture. (*Fakhoury v. Vapor Corp.* (1987), 154 Ill. App. 3d 531, 507 N.E.2d 50.) Accordingly, assuming *arguendo* that we were to agree with plaintiff that it was error to overrule her objection to being cross-examined concerning her income tax returns, we would nonetheless affirm the judgment of the circuit court (see *Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382, 387, 457 N.E.2d 9, 12 (holding that the judgment of the trial court may be affirmed if supported by any ground appearing in the record, even if not raised by the parties or considered by the trial court)), because the evidence she presented would in no event enable the jury to make a proper award for lost wages or for diminished future earning capacity.

had no income, thus exempting her from the requirement that she file a return (see I.R.C. §§6012(a)(1), (b) (1988); Treas. Reg. §1.6012–1(a)(2)(iii) (1991)); but unfortunately, unlike the Pharaoh, who had Joseph to interpret his dream, we are not told, nor was the jury told, which were the lean and which were the fat years, an element of proof which was plaintiff's to provide. However, for the purpose of this appeal, it is irrelevant which of these two reasonable inferences the jury may have drawn from the evidence presented because we may not presume that an appellant suffered some hardship from an allegedly erroneous admission of evidence, but must instead be convinced that the jury did, in fact, reach the prejudicial conclusion. (*Schaffner v. Chicago & North Western Transportation Co.* (1987), 161 Ill. App. 3d 742, 515 N.E.2d 298, *aff'd* (1989), 129 Ill. 2d 1, 541 N.E.2d 643.) Since plaintiff does not persuade us that this occurred, we must hold that defendant's single reference, and a good and proper one at that, to plaintiff's periodic failure to file tax returns, even if error, does not warrant reversal.

## C

The final evidentiary ruling with which plaintiff takes issue was defendant's use of Dr. Grear, who had performed arthroscopic surgery on her and who had previously opined that the degradation of her knees was proximately caused by the accident at issue here. Prior to trial, as a sanction for violating the deadline for the disclosure of the identity of its expert imposed by Supreme Court Rule 220 (134 Ill. 2d R. 220), the circuit court barred defendant from offering expert testimony at the trial. Plaintiff asserts that because Dr. Grear testified as an expert in defendant's favor, it defied the court's pretrial order, and the court, by not sustaining her objection to the testimony, erred.

In response, defendant offers the disingenuous argument that under our supreme court's Rule 220 jurisprudence, "once a treater, always a treater," citing *Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 529 N.E.2d 525, presumably in the belief that the holding of that opinion can be summarized in so conclusive a manner. However, it cheats the import of that decision even to suggest that it stands for the simplism that litigants may avoid the disclosure requirements of Rule 220 in all instances merely by hiring, on the eve of trial, a doctor who had previously treated, or an otherwise skilled person who had previously worked for, a party, for the express purpose of testifying as an expert against that party.

■ Instead of craftily parsing the rule as defendant proposes, *Tzystuck* employed a functional analysis to determine when one who

qualifies as an expert under the definition of Rule 220(a), but is not retained as such, must be disclosed to the opponent in the case. The desired result of the analysis is to prevent the exclusion of a witness whose testimony is probative of the truth, while at the same time ensuring that the underlying purpose of Rule 220, which is to avoid unfair surprise at trial and dampen the appeal of "guerrilla litigation" tactics, is adequately served. (See generally Vuckovich, Note, *Diminskis v. Chicago Transit Authority: Circumventing Expert Witness Discovery*, 21 Loy. U. Chi. 887 (1990).) *Tzystuck* recognized that whether an individual who qualified as an expert under subsection (a) of the rule must be disclosed turned on: (1) whether the medical expert was retained to render an opinion at trial so that interaction with the litigant may be best termed as litigation-related, or if the initial impetus for the relationship was in order to treat the litigant's physical or mental problems; (2) whether the information upon which the medical practitioner based his expert opinion was gathered in anticipation of litigation or was formed while treating the patient and has only coincidental trial value; and (3) whether the opponent of the expert opinion evidence should be held to anticipate that the expert, who was intimately involved with the underlying facts of the case, would have an opinion on some factual issue in it. *Tzystuck*, 124 Ill. 2d at 238, 529 N.E.2d at 530.[3]

In the case at bar, only the second factor militates in favor of defendant's position since Dr. Grear did initially become familiar with the substance of his opinion for reasons unrelated to the litigation. However, the other two factors weigh heavily in favor of finding that the circuit court erred either when it overruled plaintiff's objection to

---

[3]We note that our supreme court has recently indicated that it may reassess the approach to Rule 220 it took in *Tzystuck*. In *Boatmen's National Bank v. Martin* (1993), 155 Ill. 2d 305, 325, it stated:

"We note, parenthetically, that the appellate court in *Wakeford v. Rodehouse Restaurants of Missouri, Inc.* (1991), 223 Ill. App. 3d 31, 39-40, recommended that all experts be subject to Rule 220(b)(1) disclosure and that the 'retained' versus 'nonretained' distinction be determinative of the discovery requirements of Rule 220. The recommendation bears consideration by this court in its rulemaking capacity. However, because that recommendation necessarily implicates provisions which are not at issue here, we simply note the recommendation."

Although we too appreciate that a clear dichotomy, such as the one proposed by this court in *Wakeford*, would be a welcome addition to Supreme Court Rule 220 jurisprudence, we recognize that our supreme court has not yet chosen to abandon the approach it announced in *Tzystuck*. As a consequence, until the court alters its rule, we must faithfully apply it in accordance with that decision.

defendant's proffering of Grear's opinion or when it denied her follow-up motion to strike his testimony. With regard to the first factor, Grear's only relationship with defendant was pursuant to the $1,400 he received to testify for it. (See *Dugan v. Weber* (1988), 175 Ill. App. 3d 1088, 1093, 530 N.E.2d 1007, 1010 ("Rule 220 governs only those expert witnesses whose relationship with the [party offering the testimony] arose solely because [that party] retained the physician to render an opinion at trial"); *Hatch v. Golden Rule Insurance Co.* (1990), 204 Ill. App. 3d 790, 562 N.E.2d 623 (finding that an employee senior underwriter was a Rule 220 expert because he was retained solely to render an opinion regarding the cause of action).) And most important, on the last aspect of *Tzystuck*, it would be difficult to imagine that anyone in the courtroom could have been more surprised than plaintiff when she first realized that Grear would testify against her, in view of the fact not only that she was, or at least had been, his patient, but also that he had previously testified in her favor and given an opinion upon which she based a substantial portion of her case for damages. (See *Voyles v. Sanford* (1989), 183 Ill. App. 3d 833, 539 N.E.2d 801 (holding that semitruck driver's opinion need not be disclosed under Rule 220 because his testimony should not have surprised opponent, the only possible surprise would be that he testified as an expert).) Accordingly, as an expert witness for defendant, Dr. Grear was a Rule 220 expert, and thus, pursuant to the circuit court's pretrial Rule 220 sanction against defendant, it should have been barred from eliciting an expert opinion from him.

However, merely because the trial court erred with regard to the reception of such evidence does not necessitate automatic reversal of its judgment. The rule holds that unless the appellant can establish some prejudice arising from the error, the judgment need not be disturbed on appeal. (*J.L. Simmons Co. ex rel. Hartford Insurance Group v. Firestone Tire & Rubber Co.* (1985), 108 Ill. 2d 106, 483 N.E.2d 273; accord *Raines v. New York Central R.R. Co.* (1970), 129 Ill. App. 2d 294, 263 N.E.2d 895 (applying the rule and remanding a cause for a relitigation of damages issue only because evidentiary error prejudiced jurors in their deliberation of amount of award).) It does not matter that the error complained of here is a violation of Rule 220 as we have held that the appellant must nonetheless establish some prejudice thereby. *Burke v. 12 Rothchild's Liquor Mart, Inc.* (1991), 209 Ill. App. 3d 192, 197, 568 N.E.2d 80, 83 ("Even if we were to agree that [the expert] was an expert within the meaning of Rule 220, reversal would not be required because the city has failed to demonstrate how the ruling prejudiced its case"), *aff'd* (1992), 148 Ill. 2d 429, 593 N.E.2d 522; accord *Kosinski v. Inland Steel Co.* (1989), 192 Ill. App. 3d 1017, 549 N.E.2d 784. Contra

*Thompson v. Illinois Power Co.* (1992), 237 Ill. App. 3d 273, 603 N.E.2d 1303 (which seems to adopt a *per se* reversible error approach to Rule 220 violations).

The record here does not support the conclusion that plaintiff suffered any prejudice as a result of Dr. Grear's testimony, for he never retreated from his original opinion that the present condition of plaintiff's knees was directly traceable to the accident, nor did his latter testimony detract from his earlier expressed belief that as a result of the accident her knees had to be repaired at a cost in excess of $40,000. In fact, on cross-examination, he reaffirmed that he remained steadfast in those beliefs. All he did was to interpret, for the benefit of the jury, the medical significance of X rays which predated and post-dated the accident, and he explained that her present condition could have been just the natural degradation of the knees from normal use; but he never stated that he believed that to be true with regard to plaintiff's injuries. Thus, he rendered no expert opinion in defendant's favor on that particular issue.

Lastly, and more important, not only does plaintiff fail to convince that she was prejudiced by the doctor's testimony, but at one point in her brief she argues that even though defendant should not have been allowed to put Grear on the stand, his testimony nevertheless accrued no benefit to it. Accordingly, since she admittedly was not harmed by defendant's Rule 220 violation, we hold that reversal of the judgment is not necessary.

### III

The last issue before us concerns what effect, if any, the $30,000 plaintiff received from the actual tortfeasor's insurance carrier in satisfaction of their insured's liability to her should have on the extent of defendant's liability in the case at bar. She claims, in essence, that the $30,000 she received should be seen as lowering the ceiling of defendant's potential liability from the policy limit of $250,000 to $220,000. She maintains, accordingly, that she should be entitled to recover both the $30,000 she received from the tortfeasor's insurance carrier and the $60,000 the jury awarded her. We find the argument to be irredeemably without merit and undeserving of any further discussion.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

McCORMICK, P.J., and HARTMAN, J., concur.