NOTICE
Decision filed 03/23/16. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2016 IL App (5th) 150242

NO. 5-15-0242

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| JENGER DENOSKY, | ) | Franklin County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 14-D-80 |
| | ) | |
| JOHN DENOSKY, | ) | Honorable |
| | ) | Thomas J. Dinn III, |
| Respondent-Appellee. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court, with opinion.
Justices Goldenhersh and Cates concurred in the judgment and opinion.

**OPINION**

¶ 1    The petitioner, Jenger Denosky (Jenger), appeals the May 18, 2015, final order of the circuit court of Franklin County granting a judgment dissolving her marriage to the respondent, John Denosky (John). Jenger argues that the trial court abused its discretion when: (1) it failed to award her primary residential custody of the parties' three minor children, thereby failing to allow the minor children to attend school in the district where Jenger resides; (2) it awarded an equal time, week-to-week parenting schedule between the parties; (3) it denied Jenger's request to remove the minor children to her home state

1

of Louisiana; (4) it failed to award Jenger child support from John; and (5) it allowed the paternal grandmother to testify as an expert witness and give undisclosed opinions regarding the minor children. As we agree that the trial court abused its discretion by allowing the paternal grandmother to testify as an expert witness, we reverse and remand for a new trial allowing Jenger the opportunity to respond to John's expert witness testimony.

¶ 2    We set forth only the facts pertinent to our decision in this appeal. Jenger filed a petition for dissolution of marriage on May 5, 2014, and a petition for temporary relief on May 27, 2014. A settlement conference was set for August 7, 2014, at which time Jenger and her attorney were present but John and his attorney failed to appear. The court conducted a telephone conference and thereafter waived any further settlement conference. An all-day second-stage hearing was set for October 8, 2014. However, when the parties and attorneys appeared on October 8, John's attorney moved to continue the trial date, having thought the case was set for settlement conference and was therefore not prepared for trial. The court denied Jenger's request to have a hearing on her motion for temporary relief at that time. Trial was rescheduled for November 5, 2014. On October 30, 2014, the trial date was vacated, and trial was again rescheduled and held on January 22, 26, and 28, 2015.

¶ 3    In regards to the parties' requests for discovery, Jenger's attorney filed a certificate of service on July 17, 2014, confirming that interrogatories and requests to produce were provided to John. John's attorney filed his certificate confirming service of the same to Jenger on July 24, 2014. Jenger and John filed answers to each other's interrogatories

2

and requests to produce on September 8, 2014, and October 22, 2014, respectively. After a notice filed on October 17, 2014, on October 22, Jenger's deposition was taken at John's attorney's office. Jenger did not depose John or any of his witnesses.

¶ 4 The following relevant testimony was adduced at the trial. Jenger and John were married in August 2005 in Louisiana and have three children: S.D., age six; N.D., age four; and E.D., age three at the time of trial. Both S.D. and N.D. were born in Nashville, Tennessee, where the parties lived for five years. During the marriage, Jenger was primarily a homemaker, though she sporadically held jobs; John worked as an audio engineer and producer in the music business. Neither party had full-time or consistent employment, and they struggled to support themselves financially. To save money, the parties moved to John's parents' home in Royalton, Illinois, in 2010; they separated in May of 2014.

¶ 5 The parties' oldest son, S.D., attends kindergarten at Zeigler-Royalton, and N.D. attends prekindergarten (pre-k) through Headstart. S.D. and N.D. receive speech services at school through an individualized education program (IEP), a document in which the school system and the special education district outline goals and services for an individual child. Jenger testified that she is aware that both S.D. and N.D. have had developmental delays and communication difficulties. She agreed that the children should be receiving services for areas in which they are exhibiting deficiencies, that they are benefiting from those services, and that the therapists have told her S.D. and N.D. are meeting all their goals. She stated that neither S.D. nor N.D. has been medically diagnosed with a learning disability or autism, and that no medical professional has

3

suggested that S.D. or N.D. undergo an autism evaluation. She testified that S.D. has experienced night terrors since he was approximately one year old, but that he had not experienced any in her home since the separation. She agreed that the boys have some bedtime behavioral issues, but did not consider those behaviors to be out of the norm for having a house of three young boys.

¶ 6 Marcy Glover, the owner of Busy Bee Daycare where the children attended daycare from May 2012 to March 2014, testified that the children received therapy services from the State of Illinois Early Intervention program at her facility. She testified that S.D. had a difficult time adjusting, and that transitions were very difficult for him. She also noted that there was a time where he would scratch or hurt himself. Glover testified that the staff at Busy Bee worked with the parents on ways to assist S.D. by letting him know what is expected of him in a step-by-step format. Glover noted that S.D. adjusted over time, but that some of his behaviors were outside Busy Bee's realm of expertise. She agreed that N.D. exhibited similar behavior in that transitions were difficult for him.

¶ 7 Bethany Dwyer testified that she works for the Franklin-Jefferson Special Education District and sees S.D. and N.D. for speech therapy. She testified that N.D. was referred for services at the end of his 2012-2013 pre-k year, as he was struggling with "naming items and identifying body parts, things like that." She testified that N.D.'s parents had reported that he had a lot of meltdowns at home because he struggled to tell them what he needed. N.D. received speech and language services beginning with the 2013-2014 school year, and Dwyer felt he made great progress; while he still had some

4

meltdowns at school when things did not go his way, he has not had these behavior issues at school during the 2014-2015 school year. She also testified regarding his improvement in his "preservative behaviors," which she described as "things that interfere with the day-to-day routine [of a child]." She gave as an example the typically recurring noises in a school environment, noting, "The bell rings so many times during a day, and every time the bell would ring he would say, What's that, Ms. Beth? What is that? And he couldn't move on from that until we had a discussion about it." Dwyer testified N.D. is showing great progress with these behaviors as well. She testified that she works with N.D. twice a week for 25 minutes, and would remain working with him if he needed to continue services in the school district.

¶ 8    Dwyer testified that S.D. was evaluated for an IEP in the summer of 2013. She explained to the court that an IEP is a legally binding document formed under federal law and is in the same format in every state. It is developed after testing a child for particular needs and follows that child to any school in the United States; it covers anything outside of the day-to-day routine of school classroom. Dwyer stated that she began working with S.D. during the 2013 school year, visiting three times per week for 20 minutes at a time. They worked on sorting vocabulary and how to "use words to describe [facial expressions] and understanding what they mean in context and non-verbal communication." She testified that she has worked with S.D. for two years, that S.D. is comfortable with her, and that he is demonstrating progress with his communication skills, particularly at being able to relay personal stories. Dwyer did not do any of the testing for S.D.'s initial IEP, but noted that it included "some rating scales [that] were

done by the teachers at his pre-k that suggested things consistent with maybe autism." She agreed that to her knowledge, no medical professional has recommended an autism evaluation, and that both S.D. and N.D. are in regular education classrooms and doing well in them.

¶ 9   Mary Ekstrand, a school psychologist with Franklin Special Education, testified that a child receives an IEP after a team evaluation regarding the child's eligibility. Ekstrand, along with a social worker and speech therapist, assessed S.D. for his IEP. She stated that she believed that S.D.'s parents requested the testing. Ekstrand testified that a "grid meeting" is traditionally held that includes the parents and teachers; this is where the decision is made whether or not to test a child for special services needs. The grid reveals areas of suspected delays, and Ekstrand's responsibilities include reading through the grid and conducting the child's evaluation. A grid meeting for S.D. was held on April 23, 2013, and S.D.'s grid included suspected developmental delay and suspected autism spectrum disorder.

¶ 10   Ekstrand described her process for evaluating S.D. She testified that she normally begins by asking primary caregivers, such as parents and teachers, to complete questionnaires, and by observing the child in a natural setting. She stated that she observed S.D. at Busy Bee in his classroom and on the playground. She noted that his interactions with others were minimal and he seemed "prompt dependent," that is, he needed to be told each step to take during a common daily routine. She also tested S.D.'s cognitive function, noting that "rote skills," such as naming colors, shapes, or sizes, were well developed, but that his time/sequence concepts, such as directions and positions,

6

were significantly delayed. She also had S.D.'s teachers complete a Gilliam Autism Rating Scale, a behavior rating scale that measures the extent to which a child is exhibiting the characteristics of autism. Ekstrand testified that the teachers' responses indicated a high probability of S.D. having autism, as he was exhibiting atypical behaviors such as self-injury, communication delays, and difficulties with social interactions. Ekstrand concluded that S.D. met the criteria for developmental delay and recommended that S.D. receive special education services through an IEP. She also testified that not long after S.D. began his IEP, she spoke to S.D.'s parents about S.D. participating in the PEAK program, which is an assessment and treatment program for autism and related disorders that addresses a child's motor skills, academics, and social and communication skills. She noted that S.D.'s parents seemed receptive to the idea.

¶ 11 Ekstrand agreed that she worked only on S.D.'s initial IEP, but after reviewing his current IEP, it appears that he has made significant improvements; under his current IEP, S.D. is receiving only speech therapy and five minutes of behavior monitoring. Ekstrand also agreed that a child may express some symptoms that fall on the autism spectrum scale and not have autism, and that though autism is one of the categories of eligibility for an IEP, it is not the category of eligibility for which S.D. is receiving his services.

¶ 12 Cheryl Denoksy, John's mother, testified that she is retired from a position as a reading specialist with the Benton school district. She noted that she began to notice developmental issues with S.D. when he was beginning to babble and talk, around one year old; it was a "red flag" that he did not appear to respond to his name like most children do. She also noted her concern regarding S.D.'s tantrums and night disturbances,

7

and around the two-year mark, S.D. liked to have order and would be distraught if his arrangement of his toys was disturbed. Cheryl testified that she shared her concerns with Jenger and John when S.D. was around one year old. She noticed similar issues with N.D. also around one year old, such as lack of language development and responsiveness to his name. She raised her concerns with Jenger and John when N.D. was somewhere between one and two years old. She recommended that N.D. be screened for delays, and suggested activities that would be useful to "pull out the language." She suggested to John and Jenger that having routines and consistency would head off tantrums and frustration, and noted that after being implemented, the routines appeared to help. She testified that she helped John and Jenger make the decision to send the children to Busy Bee because of her connections in the community.

¶ 13    Cheryl testified that she was at the IEP meeting where the concern was raised that S.D. may be autistic. When asked if she was familiar with autism in children, Jenger's attorney objected to the use of the witness as an expert. The court stated that the witness could testify to her experience, but foundation would need to be laid for her to disclose opinion testimony. John's attorney noted that the witness was disclosed as an expert, and the following exchange occurred:

> "[Jenger's attorney]: Your Honor, less than 24 hours before the hearing [John's attorney] supplemented and said she was going to use [Cheryl Denosky] as an expert. It was not disclosed any time prior in the original answers to interrogatories that she would be attempting to use the grandmother of the children as an expert witness in this matter.

THE COURT: I think the fact that she's the grandmother really, you know, goes towards to the weight that I would give it, but if she is an expert and she's tendered as an expert and you qualify her as one–but you haven't done that yet. So you can't just jump to the end and ask her opinions.

[John's attorney]: At this point, Judge, I know I disclosed her as an opinion [*sic*]. I'm just trying to get the facts of what she witnessed, and that's really all I'm using her for. ***

THE COURT: Okay. Well, the form of your questions lend themselves to giving an opinion answer ***."

¶ 14 Several more exchanges like this took place. Cheryl testified that she believed that the children have progressed but that they still have language deficits. She noted that S.D. has made significant progress but continues to have difficulties with social interactions and with following directions. She indicated that changes bother S.D., but he does much better if he is prepped well ahead of time. When asked about "complex language patterns that are typical for [S.D.'s] age level," Jenger's attorney objected to Cheryl's testimony regarding professional observations without any foundation laid, and again objected when Cheryl testified about age-appropriate behavior. Upon the court noting that "every time [Jenger's attorney objects] I'm going to sustain it because she's right [that Cheryl has not been qualified as an expert]," John's attorney agreed to qualify her as an expert. Jenger's attorney then objected for the record that because Cheryl was only disclosed as a potential expert or opinion witness upon the eve of trial and her curriculum vitae (CV) was only provided on the eve of trial, such insufficient notice

9

should preclude Cheryl's expert testimony when Jenger did not have time to depose Cheryl or procure an expert witness of her own. John's attorney responded that while Cheryl was not initially categorized as a witness who would be giving expert opinions back in October, John did provide Cheryl's CV and that she would be a fact witness in their initial responses to discovery. The court overruled the objection and, after a foundation was laid, recognized Cheryl as an expert in education and in the formation and implementation of IEPs. Jenger's attorney renewed her objection that the failure to disclose the witness as a potential expert should bar her opinions from being admissible testimony.

¶ 15   Jenger's attorney again objected when Cheryl was allowed to testify regarding the autism spectrum disorder, as it is a medical diagnosis that S.D. has not been given as noted by numerous witnesses. Cheryl explained that it is a specific diagnosis where a child is determined to have one of five or possibly six different specific disorders, with variations within those categories. She testified that while S.D. has not been conclusively found to have autism spectrum disorder, he has received services related to the assessment and treatment for autism and related disorders through the PEAK program. She testified that S.D. attended PEAK during pre-k, and that he advanced more rapidly than they expected for his age level so that "[n]ot to say it wouldn't be needed in the future for those advanced skills" but that it was no longer needed at that time; however, S.D. continued with language therapy for his communication skills. Cheryl testified that S.D. continues to have behavioral issues, such as frustration to the point of violently acting out when he fails to get his message across or understand directions and

10

conversations. She testified that based on her experience and education, she believed that S.D.'s communication issues are not just that of a child with a language delay but more fundamental. Cheryl opined, again over objection, that regression of academic or behavior skills is a possible future issue with S.D. and that regression can occur with children who receive similar services to S.D. who change school districts. When asked if, in her opinion, any other issues exist with S.D., she noted her concerns about S.D.'s social interactions and sensory issues. She testified that based on her experience, it is possible for children with IEPs such as S.D.'s to have underlying problems that would not be reflected by his written grade in a classroom.

¶ 16 Cheryl testified that she noticed language and communication issues with N.D. when he started pre-k, as well as some coordination, fine motor, and gross motor issues, although she agreed that N.D.'s last evaluation terminated his occupational therapy. She stated that she has also noticed that N.D. struggles with perseverance in his tasks, in that he dislikes being pulled away from an activity until he is satisfied with the fascination of that activity. She opined that he exhibited atypical negative behaviors when unexpected changes occur in his daily routine. She testified that N.D. gets frustrated when he cannot do something and throws 30-minute tantrums; during the last three months, she has seen the children exhibit an average of three tantrums per day, of varying degrees, when they are in John's care, though she acknowledged that she sees them perhaps four or five days out of the week. She also observed that N.D. is afraid of loud noises and is immediately alarmed if he is exposed to them. She agreed that N.D. has an IEP, and in her experience, she has seen regression when children with similar IEPs transition from one school

district to another, though she agreed that teachers are trained to combat that regression. She noted that there is a difference in the regression seen in a typical child returning from summer break and the regression seen in a child with significant behavioral deficits because the lack of continual therapy means that "even if *** progress is being made, the time, it has to be accelerated so much more to catch[ ]up to where he would have been without the tantruming and the disruptions." Cheryl testified that she believed that both S.D. and N.D. have improved over the two-year period but still have significant issues, and neither child handles change and transitions well.

¶ 17    In its judgment of dissolution of marriage, the trial court found that "[t]he over-riding concern of the Court across the issues of custody, designation of primary residence, and removal is the effect such changes will have on [S.D.] and [N.D.] given their developmental issues and the progress that they have made in their current setting." The court noted that both children have exhibited behaviors suggestive of autism, yet at trial, Jenger "took every opportunity to point out that neither child has been diagnosed with autism. Be that as it may, the distinction of being diagnosed with autism and exhibiting 'behaviors very suggestive of the presence of autism' is distinction with little to no difference." The court noted that Jenger's "persistent efforts to minimize the significant behavioral and developmental issues plaguing [S.D.] and [N.D.] *** are not well taken by this Court."

¶ 18    The court found relevant that S.D. and N.D. are in a special education system designed to address their needs, that the program allows for the same caseworker to follow and work with them all the way through high school if necessary, and that the

witnesses at trial consistently testified that neither child reacts well to changes in routine. The court noted that though IEPs transfer over districts, the teachers implementing them do not, and "[m]oving the children from the only environment they have known, one in which they have progressed, would be too disruptive and not in the best interests of the children." Jenger appeals.

¶ 19    Though Cheryl was disclosed as a lay witness and her CV was provided to Jenger well in advance of trial, Jenger argues on appeal that the trial court abused its discretion when it allowed Cheryl to testify as an expert and give opinion testimony regarding S.D. and N.D.  Specifically, Jenger argues that John violated Illinois discovery rules where he did not disclose Cheryl as an expert witness until the eve of trial, even though the trial date had been moved twice in this matter; Jenger therefore had no knowledge of the opinions that Cheryl would offer and no opportunity to prepare or present her own expert testimony regarding the same subjects.  She maintains that the court's decision to allow the testimony was against the manifest weight of the evidence.

¶ 20    The Illinois Supreme Court rules on discovery are mandatory rules of procedure that courts and counsel must follow. *Department of Transportation v. Crull*, 294 Ill. App. 3d 531, 537 (1998).  Illinois Supreme Court Rule 213 provides that upon a written interrogatory, a party must furnish the identity of witnesses who will testify at trial, and whether those witnesses are lay witnesses, independent expert witnesses, or controlled expert witnesses.  Ill. S. Ct. R. 213(f) (eff. Jan. 1, 2007).  For each independent expert witness, the party must identify the subjects on which the witness will testify and the opinions the party expects to elicit; an answer is sufficient if it gives reasonable notice of

the testimony, taking into account the limitations on the party's knowledge of the facts known by and opinions held by the witness. *Id.* Additionally, Rule 213(i) imposes the continuing duty to supplement or amend prior responses when new or additional information becomes known to that party. Ill. S. Ct. R. 213(i) (eff. Jan. 1, 2007).

¶ 21 The discovery rules permit litigants to ascertain and rely upon the opinions of experts relied upon by their adversaries. *Crull*, 294 Ill. App. 3d at 537. The committee comments to Rule 213 plainly state that one of the purposes of Rule 213 is to avoid surprise. Ill. S. Ct. R. 213(g), Committee Comments (June 1, 1995). The committee comments also state that " 'the subject matter of all opinions must be disclosed *** and that no new or additional opinions will be allowed unless the interests of justice require otherwise.' " (Emphasis omitted.) *Crull*, 294 Ill. App. 3d at 536-37 (quoting Ill. S. Ct. R. 213(g), Committee Comments (June 1, 1995)). It appears from the record and parties' briefs that Cheryl's status as an expert witness, her professional opinions, and the bases for those opinions were not disclosed to the opposing party until, at the earliest, "a few days" before trial. However, as the respondent has admitted his failure to comply with Rule 213(f) at oral argument, our only consideration on appeal is whether the trial court abused its discretion by failing to sanction this conduct and admitting the testimony.

¶ 22 It is within the trial court's discretion to determine an appropriate sanction if a party failed to comply with the discovery rules, and trial judges have the authority to enter a wide range of orders when a party unreasonably fails to comply. Ill. S. Ct. R. 219(c) (eff. July 1, 2002). Where a party fails to comply with the provisions of Rule 213, a court should not hesitate sanctioning that party, as Rule 213 demands strict compliance.

14

*Warrender v. Millsop*, 304 Ill. App. 3d 260, 268 (1999). A trial court's error in regards to reception of evidence does not require automatic reversal; however, if the appellant can establish prejudice arising from the error, our court may disturb this judgment on appeal. *Cerveny v. American Family Insurance Co.*, 255 Ill. App. 3d 399, 416 (1993); *Hatch v. Golden Rule Insurance Co.*, 204 Ill. App. 3d 790, 795-96 (1990).[1]

¶ 23    John maintains that Jenger cannot show surprise or prejudice, as Cheryl testified as to the advice she gave Jenger and John during the marriage regarding the children's issues, and John had disclosed Cheryl as a witness and provided her CV to Jenger "well in advance of trial." He noted that his supplemented answers immediately before the trial added words to state that Cheryl would testify regarding "that due to children's history of developmental issues, removing children from IL would be detrimental to children." John also cites the fact that Jenger did not depose anyone or call any witness to testify on her behalf regarding the children's delays. We find these arguments without merit.

---

[1]Both of these cases were decided under Illinois Supreme Court Rule 220 (eff. Oct. 1, 1984), which was replaced by Rule 213. *Iser v. Copley Memorial Hospital*, 288 Ill. App. 3d 408, 410 (1997). Notably, Rule 213 establishes even more exacting standards regarding disclosure than did Rule 220, and "[t]rial courts should be more reluctant under Rule 213 than they were under former Rule 220 (1) to permit the parties to deviate from the strict disclosure requirements, or (2) not to impose severe sanctions when such deviations occur." *Crull*, 294 Ill. App. 3d at 538-39.

15

¶ 24    In regards to surprise, we note that Rule 213 not only has a stated purpose of preventing an unfair surprise on the opposing party, but also requires strict compliance. At trial, the opposing party is entitled to rely on these tenets. John's argument that Jenger should have somehow expected Cheryl to testify as an expert, despite every indication from him and his counsel that Cheryl would testify as a lay witness up until immediately preceding the trial, is disingenuous and contrary to our discovery rules. For this same reason, we do not find relevant that Jenger did not depose any witnesses or call her own expert witnesses to testify about the children's developmental delays, as up until the unexpected testimony was revealed, Jenger did not have any reason to do so, and certainly thereafter did not have time to depose Cheryl before trial began. It is apparent from the record that Jenger did not fail to be diligent in pretrial procedure, but that any failure to be prepared to rebut or respond to Cheryl's expert testimony was because John's late disclosure clearly constituted a surprise to the opposing party.

¶ 25    In regards to the prejudice resulting from the testimony, we again disagree with John's assertion that Jenger was not prejudiced by the contribution of Cheryl's expert testimony to the case. As evidenced by the transcript, Cheryl's testimony was longer and more detailed than that of the speech pathologist (Dwyer) or child psychologist (Ekstrand). The trial court appeared to place weight on the fact that the boys, who do not well tolerate changes in routine, would remain with their present caseworkers if they

stayed in their current school.[2] The concern about the boys' ability to progress outside their current environment appears to be largely based on Cheryl's testimony, as she was the only witness to testify regarding the possibilities of regression if the children were to be moved to a different school district. In fact, the other witnesses with expertise in the field, Dwyer and Ekstrand, both testified that the boys are showing progress; S.D. had moved out of the PEAK program and was only receiving speech therapy at the time of trial, while N.D. was no longer receiving occupational therapy.

¶ 26   Further, while the court noted that it would take the fact that Cheryl was the paternal grandmother into consideration when weighing the evidence, it is clear that it gave her opinions great weight, particularly in regards to her testimony regarding S.D.'s potential for autism and her opinions on his future developmental issues and diagnoses. Noting that it found "little to no difference" between behavior suggestive of autism and a medical diagnosis for autism, the trial court made it clear that it believed that Jenger was deliberately minimizing the significance of her children's delays in order to win her case. However, we reiterate that Jenger was not afforded an opportunity to depose Cheryl or to find an expert to respond to Cheryl's opinions, and as this court has no medical expertise,

---

[2]While this is true, it does not account for the numerous witnesses who explained that an IEP follows a child regardless of state or school district, that teachers are trained to combat student regression, or the fact that even if a student remains in a certain district, it does not ensure that his or her caseworker will forever retain employment in that school district.

we do not presume to know that a child showing the "red flags" of autism will most certainly receive the diagnosis and thus require its specialized management in the future. It appears that the trial court heavily relied on Cheryl's expert testimony when formulating this opinion, and in turn, this opinion was the basis of its finding that remaining in their current school system was in the best interest of the children. Upon consideration, we find that allowing Cheryl to testify as an expert witness proved highly prejudicial to Jenger's case.

¶ 27    Ultimately, Cheryl's testimony regarding the boys' developmental delays entwined her expertise in identifying these issues and her opinion on how they would continue to affect the Denosky children, and, despite John's stated intentions for his mother's testimony, was clearly not simply the observations of a grandmother who happens to have knowledge in the field of developmental delays and treatments. The court recognized this and required that she be established as an expert before allowing her opinion testimony. However, by allowing Cheryl to testify as to her professional opinions about her grandsons, Jenger was unfairly surprised and unprepared to respond with her own expert testimony regarding the impact that changing schools would have on S.D. and N.D.'s development, which was a strong consideration in the trial court's final decision. This is a violation of Illinois Supreme Court Rule 213(f) that demands an appropriate sanction under Rule 219(c). We therefore reverse and remand for a new trial that would provide Jenger the opportunity, if she so desires, to depose Cheryl as an expert witness and/or respond with her own expert witnesses.

18

¶ 28    Reversed and remanded.

2016 IL App (5th) 150242

NO. 5-15-0242

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| JENGER DENOSKY, | ) | Franklin County. |
| | ) | |
|     Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 14-D-80 |
| | ) | |
| JOHN DENOSKY, | ) | Honorable |
| | ) | Thomas J. Dinn III, |
|     Respondent-Appellee. | ) | Judge, presiding. |

_____

**Opinion Filed:**        March 23, 2016

_____

**Justices:**        Honorable Thomas M. Welch, J.

                    Honorable Richard P. Goldenhersh, J., and
                    Honorable Judy L. Cates, J.,
                    Concur

_____

**Attorney**        Amanda Byassee Gott, Attorney at Law, 611 North Court Street,
**for**           Marion, IL 62959
**Appellant**

_____

**Attorney**        Shanna K. Surratt, Layton & Southard, LLC, 1650 North
**for**           Kingshighway, Suite 302, Cape Girardeau, MO 63701
**Appellee**

_____